IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Al James Smith, #23731-056, ) | C/A No.: 1:15-2572-BHH-SVH |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | REPORT AND RECOMMENDATION |
| J. Meeks, Warden, FCI Williamsburg; ) | |
| David Massa; and Victor Loranth, ) | |
| ) | |
| Defendants. ) | |
| ) | |

Al James Smith ("Plaintiff"), proceeding pro se and in forma pauperis, filed this action seeking compensatory damages pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971),[1] and the Federal Tort Claims Act, 18 U.S.C. § 1346(b) ("FTCA"). Plaintiff is incarcerated at the Federal Correctional Institution in Williamsburg, South Carolina ("FCI-Williamsburg"), a facility of the Bureau of Prisons ("BOP"). Plaintiff alleges negligence and deliberate indifference to his serious medical needs by FCI-Williamsburg Warden J. Meeks and FCI-Williamsburg doctors David Massa ("Dr. Massa") and Victor Loranth ("Dr. Loranth").

Dr. Loranth was not served, and the service form returned to the court indicates that Dr. Loranth is deceased. [ECF No. 23]. Therefore, the undersigned recommends that Dr. Loranth be dismissed. The undersigned refers to Dr. Massa and Meeks collectively as "Defendants."

---

[1] *Bivens* established that victims of a constitutional violation perpetuated by a federal actor may sue the offender for damages in federal court despite the absence of explicit statutory authorization for such suits.

This matter comes before the court on Defendants' motion to dismiss, or in the alternative, for summary judgment.[2] [ECF No. 29]. Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the court advised Plaintiff of the summary judgment procedures and the possible consequences if he failed to respond adequately to Defendants' motion. [ECF No. 30]. The motion having been fully briefed [ECF No. 32], it is ripe for disposition.

Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(d) (D.S.C.), this case has been referred to the undersigned for all pretrial proceedings. Because the motion is dispositive, this report and recommendation is entered for review by the district judge. Having carefully considered the parties' submissions and the record in this case, the undersigned recommends that the district judge grant Defendants' motion for summary judgment.

I.     Factual and Procedural Background

Plaintiff alleges that he "[s]uffered a personal injury that resulted in the inflammation of his facial area" and that he was treated by Dr. Loranth with a medical gel that resulted in an "allergic reaction worsening" his condition. [ECF No. 1-1 at 2]. Plaintiff states that Dr. Massa and Dr. Loranth then refused to provide him further medical evaluation and that he suffered a personal injury caused by the acts and omissions of Defendants. *Id*. at 2–3.

---

[2] Because the court has considered matters outside of the pleadings, the undersigned considers the motion as one for summary judgment. The *Roseboro* order issued to Plaintiff contained an explanation of the summary judgment procedures.

On May 23, 2013, Plaintiff first submitted a sick call request for "a bad rash and bumps on side of face and neck that itches also." [ECF No. 29-9 at 2]. Dr. Massa evaluated Plaintiff the same day for a red, itchy rash on the left side of his face that developed pustules. *Id*. at 3. Plaintiff attributed the rash to having used a "dirty razor" and stated that he had used antifungal cream, with little response. *Id*. After an examination, Dr. Massa diagnosed Plaintiff with impetigo (a skin infection of red sores around the face), prescribed him an oral antibiotic, instructed Plaintiff to avoid dairy products and sun exposure for 14 days while on the antibiotic, and counseled him on the importance of hand and respiratory hygiene. *Id*. at 2–3. Despite Dr. Massa's instruction to avoid dairy, Plaintiff continued to purchase dairy items at the commissary. [ECF No. 29-10 at 5–6].

On June 11, 2013, Plaintiff sent an Inmate Request to Staff requesting an antibiotic refill for the rash on his face and neck that had "started to clear up." [ECF No. 29-9 at 5]. Dr. Massa evaluated Plaintiff at a follow-up appointment the same day, where he noted that the rash had improved dramatically, but had not totally resolved. *Id*. at 6–7. Dr. Massa renewed his prescription for antibiotics and advised Plaintiff to avoid dairy products and sun exposure for 14 days. *Id*. at 6–7. Plaintiff's commissary records reveal that he continued to purchase dairy items. [ECF No. 29-10 at 5–6].

On July 15, 2013, Plaintiff sent an Inmate Request to Staff stating that the rash on his face had become more inflamed, something was triggering it, and the rash was sore and itched. [ECF No. 29-9 at 8]. On July 18, 2013, Dr. Loranth prescribed Plaintiff a topical antibiotic gel and an oral antibiotic pill for his skin infections. *Id*. at 9. On July 21, 2013, Plaintiff reported to the health services unit that he had started the antibiotic gel

two days prior, but his face was swollen from the ointment. *Id.* at 10–12. Plaintiff self-reported multiple food and other allergies, stating that he had been eating chocolate and peanuts and using Noxema on his skin in the recent past. *Id.* Plaintiff received an injection of diphenhydramine, was advised to avoid use of all creams, ointments, and lotions on his affected areas, and was notified to use cool water flushes and cold compresses as needed. *Id.* Dr. Loranth discontinued Plaintiff's prescription for the antibiotic gel and prescribed a new medication. *Id.* at 12–14.

On July 26, 2013, Plaintiff sought treatment for a chronic rash on his groin area. [ECF No. 29-9 at 16–17]. Dr. Massa renewed his medication. *Id.* On August 2, 2013, medical staff took photographs of Plaintiff's face and neck for a referral to the BOP dermatologist. *Id.* at 18–19. Plaintiff indicated that the initial discoloration began in June 2013 and the rash had been fluctuating between spreading, flare-ups, and remission. *Id.* at 19. Plaintiff indicated that he was allergic to fish, garlic, and wool, and he was told to avoid all three items and other common allergens, such as peanuts, in an effort to improve his condition. *Id.* at 18.

On August 5, 2013, a BOP dermatologist reviewed Plaintiff's dermatology referral, medical records, and photographs of his face and neck rash. [ECF No. 29-9 at 21]. The dermatologist diagnosed Plaintiff with allergic contact dermatitis based on his "history of eczematous-like and allergic reactions." *Id.* The dermatologist prescribed desonide cream for Plaintiff's face and recommended that he wash his face only with Dove soap, use Dove Sensitive Skin Moisturizer, and stop using all other creams and products. *Id.* On August 6, 2013, Dr. Loranth prescribed desonide cream for Plaintiff to

4

apply topically twice daily for 21 days. *Id*. at 24. On August 12, 2013, Plaintiff requested a diflucan prescription from medical staff, but this was denied, as the dermatologist did not recommend this medication for his skin rash. *Id*. at 25. Dr. Loranth renewed the desonide cream prescription on August 28, 2013. *Id*. at 27.

On September 23, 2013, Plaintiff visited the health services unit complaining that the cream from the dermatologist was not working. [ECF No. 29-9 at 28]. Dr. Loranth prepared a referral consult for Plaintiff to see Dr. Jacobs, a local dermatologist, in addition to seeing the BOP dermatologist again. *Id*. On September 24, 2013, the BOP dermatologist recommended Plaintiff stop all topical cream, ointments, perfumes, and lotions on face except for prescribed desonide and Dove soap; begin keflex for ten days; discontinue diflucan (unless Plaintiff was resistant to stopping); obtain antinuclear antibody and HIV labs; schedule in-house excisional biopsies of lateral jaw and groin (where he had also reported a rash); and avoid sunlight until the pathology labs could be reviewed. *Id*. at 29, 31.

On September 26, 2013, medical staff obtained a skin biopsy of Plaintiff's left jaw and right groin area for pathology lab testing and counseled him on the plan of care. *Id*. at 36. On October 1, 2013, Plaintiff refused to have photographs taken of his face and groin area, as recommended by the BOP dermatologist for review and treatment of his skin rash. *Id*. at 39. On October 17, 2013, Dr. Loranth renewed Plaintiff's prescription for desonide. *Id*. at 42–43. On October 24, 2013, the pathology report of Plaintiff's skin condition revealed suppurative (discharge of pus), granulomatous dermatitis (inflammatory skin disease), abscess (collection of pus that has built up within the tissue)

5

and florid folliculitis (inflammation of one or more hair follicles)/carbunculosis (skin infections that form lumps and pus), with no presence of microorganisms or bacteria. *Id*. at 40–41.

On November 25, 2013, the BOP dermatologist completed a follow-up review of Plaintiff's facial rash and reviewed his laboratory report. *Id*. at 48–51. He diagnosed Plaintiff with acne rosacea on his face and neck; suggested the use of oral antibiotics and a new cream antibiotic for the next several months; and recommended that Plaintiff shave his head of all hair and wash his face with an antibiotic soap supplied by the BOP. *Id*. Dr. Loranth discussed these recommendations with Plaintiff the same day, but Plaintiff refused to shave his head. *Id*. at 55.

On November 26, 2013, Dr. Jacobs evaluated Plaintiff for his facial rash and diagnosed him with severe seborrheic dermatitis (similar to eczema) and facial folliculitis. *Id*. at 57. Dr. Jacobs recommended Plaintiff take Vitamin C, apply ketochonazole cream, and discontinue use of all cortisone creams, as this could produce the acne itself. *Id*. Dr. Loranth reviewed these findings the following day, discussed the dermatologist's recommendations with Plaintiff on November 29, 2013, and prescribed him the new medications. *Id*. at 64–68.

On December 12, 2013, the BOP dermatologist reviewed the report from Dr. Jacobs regarding the use of Vitamin C supplements and new medications. *Id*. at 71. In addition to the medications, the BOP dermatologist recommended a chest x-ray and new radiology tests for Plaintiff. *Id*. On March 24, 2014, Plaintiff sent an Inmate Request to Staff stating that the rash around his nose and eyes had gotten worse. *Id*. at 91. On March

6

25, May 5, and May 23, 2014, Dr. Loranth renewed Plaintiff's prescriptions. *Id.* at 92–95. On June 17, 2014, Dr. Jacobs evaluated Plaintiff for a follow-up appointment for his facial rash, and noted that most of his folliculitis rash had resolved. *Id.* at 97–99. Plaintiff still had seborrheic dermatitis on his face, forehead, nose, and jaw. *Id.* Dr. Jacobs recommended a prescription for Avar-E cream, a daily Vitamin C supplement, and that Plaintiff discontinue his prescriptions for doxycycline, benzyl peroxide, clindamycin, and steroid cream. *Id.* Dr. Loranth prepared Plaintiff's prescriptions on June 19, 2014. *Id.* at 99.

On December 29, 2014, Plaintiff sent medical staff an Inmate Request to Staff claiming that his face was breaking out on his nose between his eyes. *Id.* at 102. He stated he had the problem about a week and requested the antibiotics and cream previously prescribed. *Id.* On December 30, 2014, Dr. Loranth evaluated Plaintiff for two small eruptions on his face, which required no action at that time. *Id.* at 103. Dr. Loranth reminded Plaintiff that his issues had resolved after his dermatologist consult, but that no consult was clinically necessary at that time. *Id.* Dr. Loranth reminded Plaintiff that part of the reason he was having recurring outbreaks was that he continued to purchase items from the commissary to which he was allergic. *Id.*

On February 18, 2015, Plaintiff sent medical staff an Inmate Request to Staff claiming that the rash on his face had gotten worse since he had not taken any antibiotics in two months. *Id.* at 104. On February 19, 2015, Dr. Massa evaluated Plaintiff for a large boil to the right of his right nostril. *Id.* at 105. Plaintiff denied allergies to anything but

7

fish, which he denied having eaten. *Id*.[3] Dr. Massa prescribed him an antibiotic and counseled him on the importance of diet to avoid allergic reactions. *Id*. at 106.

On July 17, 2015, Plaintiff sent medical staff an Inmate Request to Staff claiming that the rash continued to stay on his nose and was spreading toward his forehead again. *Id*. at 108. He requested antibiotics or cream for the rash which had lasted the prior two months. *Id*. The health services unit staff evaluated him on the same day and noted that he needed to follow the dermatologist's recommendations. *Id*. at 109.

II.     Discussion

    A.     Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

---

[3] Plaintiff's commissary records reveal that he had continued to eat peanuts and chocolate since being told to avoid possible food allergens in July 2013. [[ECF No. 29-10].

materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact when none exists. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990).

    B.    Analysis

        1.    *Bivens* Claim

            a.    Exhaustion

Defendants argue that Plaintiff failed to exhaust his administrative remedies related to his *Bivens* claim prior to filing his lawsuit. [ECF No. 23 at 5–9]. The Prison Litigation Reform Act (PLRA), Pub. L. No. 104-134, 110 Stat. 1321 (codified as amended at 42 U.S.C. § 1997e(a) (1996)), mandates, among other things, that prisoners exhaust their administrative remedies prior to filing civil actions. *See Jones v. Bock*, 549

U.S. 199, 211 (2007); *Booth v. Churner*, 532 U.S. 731 (2001). Exhaustion is required for "[a]ll action[s]. . . brought with respect to prison conditions, whether under § 1983 or any other Federal law." *Porter v. Nussle*, 534 U.S. 516, 524 (2002) (internal quotations omitted). The PLRA's exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.*, 534 U.S. at 532. Exhaustion is a threshold requirement that must be satisfied in order for prisoner complaints to proceed. *See Jones*, 549 U.S. at 216; *Booth*, 532 U.S. at 741. The PLRA requires "proper" exhaustion, that is, "a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Woodford v. Ngo*, 548 U.S. 81, 87 (2006). "An inmate's failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by the defendant." *Anderson v. XYZ Correctional Health Services*, 407 F.3d 674, 683 (4th Cir. 2005).

The Code of Federal Regulations, at 28 C.F.R. § 542.10 *et seq.*, sets forth the administrative remedy procedure for BOP inmates. The grievance procedure is a multi-step process. Absent an exception, an inmate shall attempt to informally resolve the issue using an informal resolution form (BP-8). If the inmate is unsatisfied after attempting informal resolution, the first step in the administrative remedy procedure requires the inmate to file a formal written complaint with the Warden of the prison on a Form BP-9. The inmate's complaint must be filed with the Warden within twenty calendar days from the date of the offending event. 28 C.F.R. § 542.14(a). If the inmate is not satisfied with the Warden's response, the inmate may appeal (using a Form BP-10) to the Regional

Director of the BOP within 20 calendar days of the date the Warden signed the response. If the inmate remains dissatisfied with the response, thereafter, an inmate may appeal the Regional Office's response to the General Counsel of the Bureau by completing a Form BP-11 within thirty 30 calendar days of the date the Regional Director signed the response. *See* 28 C.F.R. §§ 542.14 and 542.15. Appeal to the General Counsel is the final level of agency review. *See* 28 C.F.R. § 542.15(a). Thus, a claim has not been administratively exhausted until it has been filed with the General Counsel.

Defendants admit that Plaintiff filed grievances related to the care and treatment of his facial rash at all levels required to exhaust his administrative remedies. [ECF No. 29 at 9–11]. However, Defendants argue that Plaintiff's failure to name Dr. Massa and Dr. Loranth in all of his administrative remedies and to specify that he was alleging a violation of his rights under the Eighth Amendment constitutes a failure to exhaust his administrative remedies. *Id.* The undersigned disagrees. A review of Plaintiff's administrative remedies reveals that they are sufficiently specific to notify Defendants that Plaintiff was not satisfied with the medical care he was receiving related to his facial rash. [ECF No. 29-5 at 14–28]. Defendants have not provided any case law supporting their argument that a medical indifference claim has not been exhausted if Plaintiff failed to identify in each of his administrative remedies the constitutional right allegedly violated or every medical provider allegedly responsible.

However, the undersigned agrees that Plaintiff has failed to exhaust his administrative remedies as to Meeks. Under these circumstances, the information contained in Plaintiff's administrative remedies is insufficient to notify Meeks that

11

Plaintiff holds him responsible for the alleged insufficient medical care, particularly because Meeks did not arrive at FCI-Williamsburg until Plaintiff had filed all of his administrative remedies. [ECF No. 29-5 at ¶ 12]. Therefore, the undersigned recommends that Meeks be granted summary judgment on Plaintiff's *Bivens* claim based on Plaintiff's failure to exhaust administrative remedies.

   b.  Medical Indifference

In the case of *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court reviewed the Eighth Amendment prohibition of punishments which "involve the unnecessary and wanton infliction of pain." *Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153, 169–73 (1976)). The court stated:

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. . . . We therefore conclude that deliberate indifference to serious medical needs of a prisoner constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Estelle*, 429 U.S. at 103–105 (citations and footnotes omitted). Despite finding that "deliberate indifference to serious medical needs" was unconstitutional, the court was careful to note, however, that "an inadvertent failure to provide adequate medical care" does not meet the standard necessary to allege an Eighth Amendment violation:

> [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions

sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 107.

The Fourth Circuit has also considered this issue in the case of *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990). In that case, the court noted that treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness, . . . nevertheless, mere negligence or malpractice does not violate the Eighth Amendment." *Id.* at 851 (citations omitted). Unless medical needs were serious or life threatening, and the defendant was deliberately and intentionally indifferent to those needs of which he was aware at the time, the plaintiff may not prevail. *Estelle*, 429 U.S. at 102–103; *Farmer v. Brennan*, 511 U.S. 825 (1994); *Sosebee v. Murphy*, 797 F.2d 179 (4th Cir. 1986).

Here, Plaintiff has not demonstrated a claim of deliberate indifference to his serious medical needs. Although Plaintiff believes he should have been seen by a local dermatologist sooner and more frequently, he was provided treatment for his facial rash on numerous occasions by BOP general practitioners, a BOP dermatologist, and a local dermatologist. In addition, Dr. Jacobs did not indicate that Plaintiff's condition was severe and did not provide a cause for his outbreak, as Plaintiff complains in his administrative remedies. Although the Constitution requires that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice. *Thomas v. Anderson City Jail*, No. 6:10-3270-RMG-KFM, 2011 WL 442053, at *3 (D.S.C. Jan. 19, 2011)*; Jackson v. Fair*, 846 F. 2d 811, 817 (1st Cir.

13

1988). While the provision of medical care by prison officials is not discretionary, the type and amount of medical care is discretionary. *See Brown v. Thompson*, 868 F. Supp. 326 (S.D. Ga. 1994). Further, a disagreement as to the proper treatment to be received does not in and of itself state a constitutional violation. *See Smart v. Villar*, 547 F. 2d 112 (10th Cir. 1976); *Lamb v. Maschner*, 633 F. Supp. 351, 353 (D.Kan. 1986). Mistakes of medical judgment are not subject to judicial review in a § 1983 or *Bivens* action. *Russell v. Sheffer*, 528 F. 2d 318, 319 (4th Cir. 1975). Because Plaintiff failed to show that his medical treatment was so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness, Defendants are entitled to summary judgment on his *Bivens* claim.

        2.     FTCA claim

Defendants argue that Plaintiff's claim pursuant to the FTCA must be dismissed because he failed to comply with the necessary requirements. The FTCA waives sovereign immunity and allows suits against the United States for personal injuries caused by government employees acting within the scope of their employment. Under the FTCA, a plaintiff may recover a monetary award from the United States for damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope . . . of employment." 28 U.S.C. § 1346(b). This includes claims under the FTCA for medical malpractice. *See Littlepaige v. United States*, 528 F. App'x 289, 291–292 (4th Cir. 2013). Whether any government employee was negligent is to be determined "in accordance with the law of the place where the act or omission occurred," here, the State of South Carolina. 28 U.S.C. § 1346(b)(1).

14

To pursue a medical malpractice claim in South Carolina, a plaintiff is first required to file "as part of the complaint an affidavit of an expert witness which must specify at least one negligent act or omission claimed to exist and the factual basis for each claim . . .," and a failure to file such an affidavit with the complaint requires dismissal of the case in state court. S.C. Code Ann. § 15-36-100; *see also Allen v. U.S. Rotureau v. Chaplin*, No. 2:13-2470-RMG, 2015 WL 1517510, at * 3 (D.S.C. April 1, 2015). Although Plaintiff filed in federal court under the FTCA, and not in state court, the filing of such an affidavit is nevertheless a mandatory prerequisite to the filing of a malpractice claim against the United States under the FTCA in this District. *See Chappie v. U.S.*, No. 13-1790, 2014 WL 3615384 at * 1, 5 (D.S.C. July 21, 2014); *Millmine v. Harris*, No. 10-1595, 2011 WL 317643 (D.S.C. Jan. 31, 2011) (holding that pre-suit notice and expert affidavit requirements in S.C. Code Ann. § 15-36-100 and § 15-79-125 are the substantive law in South Carolina). Therefore, Plaintiff's failure to provide an expert affidavit as part of his complaint is fatal to his FTCA claim and the undersigned recommends Defendants be granted summary judgment.

III.    Conclusion and Recommendation

For the foregoing reasons, it is recommended that the district judge grant Defendants' motion for summary judgment [ECF No. 29].

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

July 28, 2016                                      Shiva V. Hodges
Columbia, South Carolina               United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 901 Richland Street
> Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).